UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| KEITH COBB,<br>    Plaintiff, | No. 3:17-cv-00291 (MPS) |
|---|---|
| v. | |
| ATRIA SENIOR LIVING, INC. and TERRY JACKSON<br>    Defendants. | |

## RULING ON THE DEFENDANTS' MOTION TO DISMISS, IN PART, THE AMENDED COMPLAINT

Plaintiff Keith Cobb filed this action against Defendants Atria Senior Living, Inc. ("Atria") and Terry Jackson (collectively, "Defendants") after he was terminated from his position as a nurse at one of Atria's assisted living facilities. Defendants move to dismiss Cobb's claims for hostile work environment and/or quid pro quo sexual harassment and discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") (Count One); retaliation under Title VII (Count Two); gender discrimination and sexual harassment under the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statute ("Conn. Gen. Stat.") §§ 46a-60(a)(8), 46a-60(a)(1) (Count Three); retaliation under CFEPA, Conn. Gen. Stat. § 46-60(a)(4) (Count Four); and retaliation for constitutionally protected speech under Conn. Gen. Stat. § 31-51q (Count Six). (ECF No. 24.)[1]

For the reasons discussed below, I GRANT the motion to dismiss with respect to Cobb's gender discrimination claims (Counts One and Three), and DENY the motion to dismiss with respect to Cobb's retaliation claims (Counts Two, Four, and Six).

    **I.    Factual Allegations**

---

[1] Defendants do not move to dismiss Count Five, alleging impermissible termination in retaliation for whistleblowing activity under Conn. Gen. Stat. § 31-51m.

1

### A. Cobb's Employment at Atria

Cobb is a white male and was 54 years old at the time he filed the Amended Complaint. (ECF No. 22 ¶ 16.) In April 2011, Cobb began working for Atria, a corporation that operates private senior living facilities, at an assisted living facility in Stamford, Connecticut. (*Id*. ¶¶ 5, 18.) Cobb worked as a nurse and caregiver to the senior residents at the facility. (*Id*. ¶ 19.) Cobb received consistently positive reviews for all four years of his employment with Atria. (*Id*. ¶ 20.)

### B. Cobb Opposes Sexual Harassment and Discrimination Directed at a Female Colleague

During his employment at Atria, Cobb learned of sexual harassment and discrimination directed toward a female nursing colleague, Ms. Rutherford. (*Id*. ¶¶ 22-23.) Cobb alleges that Defendant Jackson, an Executive Director at Atria, frequently harassed Rutherford, insisting that Rutherford talk with Jackson about personal matters, asking her to hug him, and making romantic advances toward her, embarrassing Ms. Rutherford in front of others. (*Id*. ¶¶ 23-26.) Cobb alleges that Rutherford refused Jackson's advances, and that Jackson became angry and resentful as a result. (*Id*. ¶ 27.) One on occasion in April 2015, Cobb alleges that Rutherford was alone with Jackson in an elevator in the Stamford facility and decided not to interact with Jackson. (*Id*. ¶ 28.) Jackson later reprimanded Rutherford in his office, stating, "when I come around you need to smile more and talk to me." (*Id*. ¶¶ 29-30.) Jackson threatened to "write up" Rutherford if she did not accede to his overtures. (*Id*. ¶ 31.)

Rutherford told Cobb about her experiences in the elevator and being reprimanded by Jackson. (*Id*. ¶ 32.) Rutherford expressed to Cobb that she feared she would lose her job if she did not comply with Jackson's demands. (*Id*. ¶ 34.)

Cobb encouraged Rutherford to file a formal complaint of sexual harassment with Atria's Human Resources Department employee hotline in order to stop Jackson's behavior. (ECF No. 22

¶ 35.) Rutherford registered a complaint with the hotline on May 1, 2015. (*Id*. ¶ 36.) After learning of the complaint from Human Resources, Jackson became angry that Cobb had encouraged Rutherford to make a complaint; Cobb alleges that Jackson directed discriminatory and retaliatory animus at Cobb due to his male gender, because of the friendship and confidence Cobb shared with Rutherford, which made Jackson jealous. (*Id*. ¶¶ 40-42.)

### C. Cobb Provides Information to the Connecticut Department of Health During an Investigation Into the Death of an Elderly Resident

In January 2014, an elderly resident at the Stamford facility passed away two days after she wandered outside, becoming exposed to extreme cold for an unknown period of time. (*Id*. ¶¶ 44-47.) Cobb helped locate the resident, took her vital signs, and cared for her until the end of his shift. (*Id*. ¶ 45.)

In December 2014, the Connecticut Department of Health ("DOH") began investigating the resident's death by conducting on-site interviews with Atria personnel, including Cobb, regarding the incident. (*Id*. ¶¶ 48-50.) Atria senior management, including Jackson, discouraged Cobb and his coworkers from reaching out to DOH, instructing them to cooperate minimally with the investigation. (ECF No. 22 ¶ 50.) Cobb and others were instructed to attend DOH investigative interviews and answer questions, but not to otherwise contact or volunteer information to DOH. (*Id*. ¶ 51.)

Cobb participated in at least one interview with DOH in January 2015 and "was able to review" a compilation of information that DOH had gleaned from its interviews with Atria personnel. (*Id*. ¶¶ 52, 55.) Cobb became concerned that DOH's information was inaccurate or incomplete, and that Atria management was not forthcoming in its response to the investigation. (*Id*. ¶¶ 56-57, 61.) Cobb decided to provide additional information to DOH "outside of the formal

3

investigation," and did so in a 20- to 30-minute phone call with a DOH investigator, placed from his cell phone, outside the workplace, and on his own time. (*Id*. ¶¶ 58-59.)

After DOH concluded its investigation, and a few days before a formal public hearing regarding the incident, Cobb informed Jackson that he had provided additional information to DOH outside the formal investigation. (ECF No. 22 ¶ 63.) Jackson "angrily sneered" at Cobb and told him that he knew what Cobb had done. (*Id*. ¶ 65.) Atria's senior management became hostile to Cobb and blamed him after Atria was determined to be at fault and fined at the conclusion of the investigation. (*Id*. ¶ 67.)

### D. Cobb's Termination

On May 29, 2015, less than two weeks after the DOH's formal hearing and determination of Atria's culpability, Cobb was terminated from his position at Atria. (*Id*. ¶ 68.) Cobb alleges that he was terminated in retaliation for cooperating with the DOH investigation and for encouraging Rutherford to file a formal sexual harassment complaint. (*Id*. ¶¶ 68-69.)

### E. Administrative Complaints and This Lawsuit

After receiving a right-to-sue letter from the CHRO on November 22, 2016, Cobb filed this lawsuit. (*Id*. ¶ 14; ECF No. 1.) Cobb brought claims for hostile work environment and/or quid pro quo sexual harassment and discrimination under Title VII (Count One), retaliation under Title VII (Count Two), gender discrimination and sexual harassment under Conn. Gen. Stat. §§ 46a-60(b)(1) and 46a-60(b)(8) (Count Three), retaliation under Conn. Gen. Stat. § 46a-60(b)(4) (Count Four), retaliation for whistleblowing under Conn. Gen. Stat. § 31-51m (Count Five), and retaliation for constitutionally protected speech under Conn. Gen. Stat. § 31-51q (Count Six). Defendants moved to dismiss all of Cobb's claims except for Count Five, incorporating prior briefing filed before the Court permitted Cobb to file the Amended Complaint. (ECF No. 12; ECF No. 24.)

4

## II. Legal Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts all of the complaint's factual allegations as true when evaluating a motion to dismiss. *Id.* at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant [a] defendant[']s motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Iqbal*, 556 U.S. at 680).

## III. Discussion

### A. Gender Discrimination in Violation of Title VII and CFEPA (Counts One and Three)

Cobb concedes that he lacks standing to assert a claim of hostile work environment discrimination for any conduct directed at his female coworker. (ECF No. 25 at 2 n.1.) Therefore, I consider Cobb's hostile work environment and sexual harassment claims under Title VII and

5

CFEPA abandoned. I consider Defendants' motion to dismiss Counts One and Three only as it relates to Plaintiff's claims that he was subject to discrimination based on his own gender.

To state a claim for discrimination under Title VII and CFEPA,[2] a plaintiff must plausibly allege, "in the absence of direct evidence of discrimination," that he "is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). "As to the last prong, the facts pled need only give 'plausible support to a minimal inference of discriminatory motivation.'" *Sellers v. First Student, Inc.*, No. 16-CV-236 (JCH), 2016 WL 6440111, at *4 (D. Conn. Oct. 28, 2016) (quoting *Littlejohn*, 795 F.3d at 311).

Cobb plausibly alleges that he was a member of a protected class, that he was qualified for his position,[3] and that he suffered an adverse employment action when he was terminated. The only allegation Cobb puts forth to support his claim that he was terminated because of his gender, however, is that "Jackson was angry . . . at Plaintiff due to his gender as a male because of the friendship and confidence Plaintiff enjoyed with Ms. Rutherford, which made Jackson jealous." (ECF No. 22 ¶ 42.) Even when all reasonable inferences are drawn in favor of Cobb, this allegation provides no basis on which to conclude that Defendants were motivated by discriminatory intent

---

[2] The Court analyzes a gender discrimination claim under CFEPA using the same standards that govern a federal Title VII claim. *See Martin v. Town of Westport*, 558 F. Supp. 2d 228, 242 (D. Conn. 2008) ("As with CFEPA discrimination claims, Connecticut courts look to federal law for guidance when analyzing CFEPA hostile work environment claims.").

[3] Cobb's allegation that he began working at Atria's Stamford, Connecticut facility in April 2011, that he had "consistently positive reviews for all four . . . years of his employment," and that he had over "ten . . . years of experience working as a nurse, including significant employment with assisted living facilities and care of the elderly," satisfies the minimal burden required to establish that he was qualified for his position. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.").

in terminating Cobb: Cobb does not allege that Defendants would have treated or actually treated any woman differently, that Defendants had a history of sex discrimination, that Defendants made remarks to or about him reflecting discriminatory animus, or that Defendants replaced him with a woman. *See, e.g.*, *Hamzik v. Office for People with Developmental Disab.*, 859 F. Supp. 2d 265, 279 (N.D.N.Y. 2012) (holding that plaintiff failed to state a Title VII sex discrimination claim because the complaint was "devoid of any allegations from which it can be reasonably inferred that the defendants' action was taken because of his sex"). Cobb alleges that Jackson was jealous of Cobb's friendship with Rutherford, but that does not suggest gender-based animus, and he otherwise only conclusorily asserts that Jackson's "animus" towards him was "due to his gender." (ECF No. 22 ¶ 42.) This is insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Cobb's only argument in support his gender discrimination claim consists of two sentences in a footnote in his brief: "[w]hether Plaintiff has been subjected to discrimination based upon his own gender until Title VII and CFEPA is a closer call [than whether Plaintiff may assert a hostile work environment claim]," and "that a determination on this issue may be premature in the absence of discovery on the motivation for his termination." (ECF No. 25 at 2-3 n.2.) Cobb marshals no support for these assertions, and provides no analysis. He devotes no section of his brief to responding to Defendants' arguments that he has insufficiently pled a gender discrimination claim. Thus, he has abandoned the claim. *See e.g.*, *Lami v. Stahl*, No. 3:05-cv-1416 (MRK), 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."). In any event, Cobb fails to plausibly allege that he was subject to

gender discrimination in violation of Title VII and the CFEPA. I grant Defendants' motion to dismiss Counts One and Three.

**B. Retaliation in Violation of Title VII and CFEPA (Counts Two and Four)**

Defendants also move to dismiss Cobb's claims under Title VII and the CFEPA[4] that Defendants retaliated against him for encouraging Rutherford to report sexual harassment. To state a claim for retaliation under Title VII[5] and the CFEPA,[6] a plaintiff must plausibly allege that "(1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). Thus, Cobb must allege that the but-for cause of his termination was engagement in protected activity.[7]

---

[4] "As with hostile environment claims, Connecticut and federal retaliation claims operate under the same legal framework." *Flowers v. N. Middlesex YMCA*, 3:15-cv-705 (MPS), 2016 WL 1048751, at *7 (D. Conn. Mar. 11, 2016) (citing *State v. Comm'n on Human Rights & Opportunities*, 211 Conn. 464 (1989) ("Although the language of [Title VII] and that of the Connecticut statute differ slightly, it is clear that the intent of the legislature in adopting [CFEPA] was to make the Connecticut statute coextensive with the federal.")).
[5] The anti-retaliation provision of Title VII states, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).
[6] The anti-retaliation provision of the CFEPA states, in relevant part: "It shall be a discriminatory practice in violation of this section . . . [f]or any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding [before the CHRO]." Conn. Gen. Stat. § 46a-60(b)(4).
[7] Cobb is not precluded, of course, from pleading alternative theories of causation under Federal Rule of Civil Procedure 8(d)(2), despite the ultimate requirement that he prove the but-for cause of his termination. *See, e.g.*, *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496-97 (E.D.N.Y. 2011) (holding that "by identifying multiple 'significant factors' that may have

Under Title VII, protected activity includes both "opposing discrimination proscribed by the statute and . . . participating in Title VII proceedings." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Cobb neither alleges nor argues that he participated in Title VII proceedings; at issue is whether he "oppos[ed] discrimination" within the meaning of Title VII and the CFEPA.

The opposition clause of Title VII "makes it unlawful for an employer to retaliate against an individual because [he] 'opposed any practice' made unlawful by Title VII . . . ." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)). Protected activity includes "expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). The Supreme Court clarified in *Crawford v. Metropolitan Government of Nashville & Davidson County* "that any activity designed 'to resist or antagonize . . . ; to contend against; to confront; resist; [or] withstand' discrimination prohibited by Title VII constitutes a protected oppositional activity." *Littlejohn*, 795 F.3d at 317 (quoting *Crawford*, 555 U.S. 271, 276 (2009)). "[I]f an employee . . . actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." *Id.* at 318 (quoting *Sumner*, 899 F.2d at 209).

Cobb alleges that he opposed a form of employment discrimination when he "encouraged Ms. Rutherford to file a formal complaint of sexual harassment with [the HR] employee hotline in order to get Jackson to stop [his] behavior," and that Jackson's anger with him as a result of his encouragement was a motivating factor in Cobb's termination. (ECF No. 22 ¶¶ 35, 42-43.) Cobb

---

motivated the Defendants' ultimate decision to terminate their employment, the Plaintiffs did not, as a matter of law, affirmatively allege that age was not the 'but for' cause").

9

does not specifically allege that he communicated his opposition to Defendants, but he does allege that Jackson was aware of it. (*Id.* ¶¶ 42-43.)

At least one court in the Second Circuit dismissed a Title VII retaliation claim under what Defendants argue are analogous circumstances, finding that "expressing one's belief about management's racist tendencies in confidence to a co-worker and giving . . . advice cannot qualify as opposition to a Title VII violation." *Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 425-26 (S.D.N.Y. 2016). The Court in *Bliss* found that the plaintiff's actions—including expressing her belief to a co-worker that a supervisor was racist and advising the co-worker to pursue a discrimination claim—were "a far cry from even the 'informal' protests outlined by the *Sumner* court, which at the very least involved some act of complaining or protesting." *Id.* at 425. The *Bliss* Court noted that there was no allegation that the plaintiff made management aware of her belief or that the co-worker actually filed a claim. *Id.* Cobb argues that his opposition consisted of "more than mere suspicion of discrimination towards another employee," because he based his encouragement on the account of harassment conveyed to him by Rutherford, and because Rutherford actually registered a complaint in response to Cobb's encouragement, making his activity distinguishable from the plaintiff's in *Bliss*. (ECF No. 25 at 11.)

At this stage, it is unclear how Defendants became aware of his encouragement of Rutherford's filing of a complaint if Cobb's support for Rutherford was not overt, and whether Jackson's alleged "hostility" toward Cobb was the result of Cobb's "antagoniz[ing]," "confront[ing]," or "resist[ing]" Jackson's alleged harassment of Rutherford. Thus, it is premature to hold as a matter of law that Cobb's support for Rutherford's complaint against sexual harassment is not protected activity under Title VII.

Cobb also argues that he adequately asserts a "zone of interests" third-party retaliation claim, even if his own actions do not qualify as protected activity under Title VII. (ECF No. 25 at 12.) Defendants agree that "under limited circumstances, an employee can establish a claim of retaliation if he suffers an adverse employment action because someone with whom he shares a close relationship engaged in protected activity." (ECF No. 26 at 5.) *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (holding that employer's alleged act of firing employee in retaliation against employee's fiancée, if proven, constituted unlawful retaliation, as "a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired").

Defendants' principal objection to Cobb's third-party retaliation theory is that he has not alleged that he and Rutherford shared a sufficiently close relationship to support such a claim. Defendants point out that the cases Cobb relies on involved termination of a fiancée, a daughter, and a husband in retaliation for the protected activity of a fiancé, father, and wife, respectively. (ECF No. 26 at 5.) *See Thompson*, 562 U.S. at 174 (upholding third-party retaliation claim involving fiancée); *Ferguson v. Fairfield Caterers, Inc.*, No. 3:11-cv-01558 (JAM), 2015 WL 2406156, at *4 (D. Conn. May 20, 2015) (acknowledging in ruling on post-trial motions that "plaintiff's retaliation claim was not precluded by the fact that it was her father—and not her—that engaged in protected activity"); *Rajaravivarma v. Bd. of Trs. For the Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 164-65 (D. Conn. 2012) (holding that plaintiff could maintain a third-party retaliation claim based on his wife's protected activity).

While Cobb and Rutherford's relationship was arguably not as close as the relationships in the cases cited above, there is no rule that the relationship must be familial or even romantic. *See, e.g.*, *E.E.O.C. v. Fred Fuller Oil Co., Inc.*, No. 13-cv-295-PB, 2014 WL 347635, at *6 (D.N.H.

11

Jan. 31, 2014) (upholding a retaliation claim brought by a "close friend" of an individual who engaged in protected conduct); *Ali v. Dist. of Columbia Govt.*, 810 F. Supp. 2d 78, 89 (D.D.C. 2011) (denying summary judgment on third-party retaliation claim brought by the "best friend" of the individual who engaged in protected conduct).

Cobb alleges that Rutherford told him about the harassment she experienced, "as they shared a collegial work relationship and trust." (ECF No. 22 ¶ 23.) She "reported her experience" to Cobb while "on the verge of tears" and "expressed to [Cobb] that she feared that she would lose her job if she did not comply with Jackson's demands." (*Id*. ¶¶ 32-34.) Cobb alleges that Jackson became angry and jealous in part "because of the friendship and confidence" that Cobb enjoyed with Rutherford. (*Id*. ¶ 42.) Cobb provides no other facts about the nature of his relationship with Rutherford, however, such as how long they had known each other, whether they often confided in one another, and whether they had spent time together outside the workplace.

At this early stage of litigation, Cobb's allegations that he and Rutherford shared a relationship of friendship and confidence—which was the source of jealousy by Jackson and which led Rutherford to confide in Cobb about her experience of harassment while on the verge of tears— is sufficient to plead a third-party retaliation claim. Discovery is necessary to determine whether terminating Cobb after Rutherford registered a sexual harassment complaint was an act that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," as required to support a retaliation claim under *Thomas*. I deny Defendants' motion to dismiss Cobb's Title VII and CFEPA retaliation claims.

### C. Retaliation for Protected Speech Under Conn. Gen. Stat. § 31-51q (Count Six)

Finally, Defendants move to dismiss Cobb's claim that Defendants retaliated against him for engaging in protected speech by providing information to DOH investigators about the death

of an elderly resident at the facility. "Section 31-51q[8] of the Connecticut General Statutes is a cause of action for violation of the right to free speech under both the United States and Connecticut Constitutions." *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 477-78 (D. Conn. 2016). "To state a claim under Section 31-51q, a plaintiff must allege that (1) he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his First Amendment rights [or his rights under the Connecticut Constitution] did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer." *Trusz v. UBS Realty Investors*, No. 3:09cv268 (JBA), 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010) (quoting *D'Angelo v. McGoldrick*, 239 Conn. 356, 361 (1996)). The statute has been construed to impose the same prohibitions on private employers that the First Amendment the Connecticut Constitution impose on public employers. *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 211-18 (2015).

The Connecticut Supreme Court has held that "textual differences" between the provisions of the Connecticut Constitution protecting freedom of speech and the First Amendment "warrant an interpretation [of the Connecticut Constitution's speech protections] separate and distinct from that of the first amendment." *Id*. at 193. Because a claim under Section 31-51q requires the exercise of rights under either the First Amendment or the Connecticut Constitution, and because Cobb invokes both (ECF No. 22 ¶ 99), I first consider whether Cobb sufficiently alleges that he engaged

---

[8] The statute provides, in relevant part: "Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution . . . , provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . ." Conn. Gen. Stat. § 31-51q.

13

in speech protected by the First Amendment. I then consider whether Cobb sufficiently alleges that he engaged in speech protected by the Connecticut Constitution.

1. Protected Speech Under the First Amendment

A court must engage in a two-step inquiry to determine whether an employee's speech is protected for the purpose of a First Amendment retaliation claim. *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). First, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)). "This step one inquiry in turn encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Matthews*, 779 F.3d at 172 (internal quotation marks omitted). Under the U.S. Supreme Court's decision in *Garcetti*, which the Connecticut Supreme Court has held applies to claims brought against private employers under Section 31-51q, *see Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 611 (2012), "when . . . employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. If the answer to either of the two subquestions is no, that is the end of the matter. *Matthews*, 779 F.3d at 172. If the answer to both is yes, courts turn to the remainder of the First Amendment analysis set forth in *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983). *Schumann*, 304 Conn. at 604.[9]

---

[9] I need not address the remainder of the *Pickering/Connick* analysis, as Defendants do not move to dismiss on the grounds that Count Six fails that test, arguing only that Cobb's claim fails because he did not engage in protected speech.

14

Cobb has sufficiently alleged that the subject of his speech was a matter of public concern. "A matter of public concern is one that relates to any matter of political, social, or other concern to the community." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (internal quotation marks omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ." *Id*. Courts also consider "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Id*. Cobb alleges that he provided a DOH investigator "with additional information regarding the January 2014 incident" but does not specifically allege the content of his statements. (ECF No. 22 ¶ 59.) Nonetheless, the form of his communications—an off-the-clock cell phone call to a state investigator—and the context of the speech, a state agency investigation into the death of a resident at an assisted living facility, suggest that Cobb's speech was calculated to have a broader public purpose and to address an issue of concern to the community, namely, whether assisted living facility personnel properly supervised elderly residents, and went beyond a personal grievance. His allegation that he was "concerned that Atria senior management was not forthcoming in the adequacy of its cooperation and response to the DOH investigation" further suggests that he spoke to address a matter of social concern—that a corporation in the assisted living industry (which Cobb alleges employs over 13,500 people) was mishandling the response to a state agency investigation into a death. (*Id*. ¶¶ 11, 61.) Especially because I must draw reasonable inferences in his favor at this stage, I conclude that Cobb's speech related to a matter of public concern.

As a nurse at an assisted living facility tasked with caring for and supervising residents, however, Cobb spoke pursuant to his official duties, and therefore spoke solely as an employee, rather than as a citizen, for the purpose of his First Amendment retaliation claim. "[T]he speech at issue does not merit the protection of the First Amendment if the speech owed its existence to the

plaintiff's job duties and was made in furtherance of those duties." *Gwozdz v. Genesis Physician Servs.*, No. 13-cv-317 (AWT), 2014 WL 943116, at *2 (D. Conn. Mar. 11, 2014) (quoting *Looney v. Black*, 702 F.3d 701, 717 (2d Cir. 2012)) (internal quotation marks and alterations omitted). The Court's inquiry as to whether Cobb made statements pursuant to his official duties "is 'a practical one' . . . and entails 'consideration of the employee's level of responsibility and the context in which the statements were made.'" *Gwozdz*, 2014 WL 943116, at *2 (quoting *Garcetti*, 547 U.S. at 424; *Schumann*, 304 Conn. at 604). "Put simply, on-the-job speech generally is 'pursuant to' an employee's duties when it is 'part-and-parcel of his concerns about his ability to properly execute his duties.'" *Schumann*, 304 Conn. at 614 (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)).

Courts have found that employee speech regarding patient safety in fields related to healthcare is unprotected by the First Amendment. *See, e.g.*, *Schumann*, 304 Conn. at 616 (holding that pathologist's statements about the safety of a new product to the director of defendant's medical laboratory were pursuant to his job duties and therefore unprotected speech); *Gwozdz*, 2014 WL 943116, at *4 (granting motion to dismiss Section 31-51q claim brought by nurse who reported workplace safety and health hazards to her superiors, the Department of Labor, and the Board of Examiners for Nursing outside the chain of command).

Cobb alleges that he became involved with the January 2014 incident because, as a nurse at the facility, he "took [the] resident's vital signs and provided care [to] the resident until the end of his shift." (ECF No. 22 ¶ 45.) He participated in at least one workplace interview about the January 2014 incident because he was instructed to do so by his employer. (*Id*. ¶¶ 51-52.) Because "[p]art of the investigation related to the adequacy of the security of the building and the amount of oversight being provided to the elderly residents" (*Id*. ¶ 53), and because Cobb "was motivated

to seek out additional opportunities to provide information and testimony to the DOH in light of his experience providing responsible and effective patient care" (*Id.* ¶ 60), Cobb's statements regarding the resident's safety were "part-and-parcel of his concerns about his ability to properly execute his duties" as an assisted living facility nurse and therefore are not protected speech. *See Schumann*, 304 Conn. at 615. Though he also alleges that he provided "additional information [to the DOH investigator] regarding the January 2014 Incident" due to his "concern[] about the amount of cooperation being provided to the DOH investigation by Atria management, Cobb's statements "owed their existence to [his] job duties and were made in furtherance of [his] duties" of ensuring adequate care and supervision for the elderly residents at the facility. *Gwozdz*, 2014 WL 943116, at *4.

The fact that Cobb made his statements outside the chain of command does not render the speech protected. *See Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011) (holding that security director's statements outside chain of command to district attorney about corruption within the transportation authority were not protected); *Gwozdz*, 2014 WL 943116, at *3 (that nurse made statements to the Department of Labor and the Board of Examiners for Nursing outside chain of command did not render speech protected). Therefore, Cobb's Section 31-51q claim fails to the extent it rests on the First Amendment.

2. Protected Speech Under the Connecticut Constitution

Cobb's Section 31-51q claim survives, however, as his allegation that he engaged in speech protected by the Connecticut Constitution is governed by a less stringent standard. The Connecticut Supreme Court held in *Trusz v. UBS Realty Investors, LLC* that the Connecticut Constitution provides broader protection for employee speech than does the federal Constitution, and protects even speech made pursuant to an employee's official job duties as long as the speech

is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety . . . ." 319 Conn. 175, 211 (2015) (quoting *Garcetti*, 547 U.S. at 435 (Souter, *J*., dissenting)); *see also id.* at 179 (holding that section 31-51q "extends the same protection to employee speech pursuant to official job duties in the private workplace" as is provided by the Connecticut Constitution).

Though Cobb spoke pursuant to his official duties as a nurse, Cobb also alleges that he "was very concerned that the information contained in the DOH's compilation [of information gleaned from interviewing Atria personnel] was inaccurate and incomplete" and that he "was additionally concerned that Atria senior management was not forthcoming in the adequacy of its cooperation and response to the DOH investigation." (ECF No. 22 ¶¶ 56, 61.) Construed in the light most favorable to Cobb, these allegations set forth a plausible claim that his statements to the DOH investigator outside of his workplace interviews were, at least in part, a comment on Defendants' "official dishonesty" or "serious wrongdoing." *See Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 478-79 (D. Conn. 2016) (denying motion to dismiss Section 31-51q claim, as plaintiff's claim that she made reports to auditors in an attempt to uncover employer's unethical practices sufficiently alleged official dishonesty); *Trusz v. UBS Realty*, No. 3:09-cv-00268 (JAM), 2016 WL 1559563, at *9 (D. Conn. Apr. 18, 2016) (holding that speech accusing employer of regulatory or civil wrongs could constitute "serious wrongdoing"). Moreover, drawing all reasonable inferences in Cobb's favor, I find that Cobb's concerns for "providing responsible and effective patient care" in the wake of a resident's death suggests that his speech may also have been a comment on "threats to health and safety" and therefore protected. (ECF No. 22 ¶ 60.) Because I find that Cobb sufficiently alleged that he engaged in protected

speech under state law, I deny Defendants' motion to dismiss Cobb's Section 31-51q retaliation claim to the extent it is based on the Connecticut Constitution.

**IV.     Conclusion**

For the reasons stated above, the motion to dismiss is GRANTED in part and DENIED in part. Counts One and Three are DISMISSED. The case will proceed on Counts Two, Four, Five, and Six.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           January 29, 2018